1   Bahig Saliba

2   10824 East Santa Fe Trail

3   Scottsdale, Arizona  85262

4   Ph. 480-235-0304

5   Email: medoverlook@protonmail.com

FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

AUG 0 1 2023

SEAN F. McAVOY, CLERK
_____ DEPUTY
SPOKANE, WASHINGTON

6

7   **IN THE UNITED STATES DISTRICT COURT**

8   **FOR THE EASTERN DISTRICT OF WASHINGTON**

9

10   **Bahig Saliba,**          Case No.  **2:23-cv-00218-MKD**

11   **Plaintiff,**

12   **v.**                     **COMPLAINT**

13   **Spokane International Airport;**   **AND JURY DEMAND**

14   **Officer Richard Holschen;**

15   **Officer Clay Creek**

16   **and**

17   **Sergeant Tarina Rose-Watson,**

18   **Acting as security police officers**

19   **Defendants,**

20

21

22

23   COMES NOW Plaintiff, *Pro Se,* Bahig Saliba, an airline Captain in the employ of American

24   Airlines, Inc. (AA) (Inactive since December 6, 2021, as a result of Defendants' actions) and files this

25   Complaint against Spokane International Airport; Officer Richard Holschen; Officer Clay Creek, and

26   Sergeant Tarina Rose-Watson, Defendants.  Action taken against Defendants in the United States

27   District Court for the District of Arizona on April 5, 2022, dismissed on March 20, 2023, for lack of

1  personal jurisdiction.  A March 22, 2023, motion to transfer the complaint was denied.  Plaintiff files

2  a new complaint.

3      This dispute arises out of a December 6, 2021, event at the Spokane International Airport,

4  during which the Plaintiff was racially profiled[1] and unlawfully detained by the Defendants who

5  conspired with the Plaintiff's employer to exact maximum punishment, in violation of rights protected

6  by the Constitution of the United States of America, resulting in the Plaintiff's indefinite suspension

7  without pay and financial loses in the hundreds of thousands and the potential termination of his

8  employment.

9      The Plaintiff has a claim under 42 U.S. Code §1983 and alleges the Defendants racially profiled

10 him, were in violation of the Transportation Security Administration (TSA) Security Directive 1542-

11 21-01B (SD 1542-21-01B) exemption in § F3; 49 U.S. Code § 114 (g)(2) – TSA Authority of other

12 departments and agencies; 49 U.S. Code §1544.235 – Training and Knowledge for Individuals with

13 Security-Related Duties; 18 U.S. Code 241 – Conspiracy Against Rights; 18 U.S. Code 242 –

14 Deprivation of Rights Under Color of Law and 6 U.S. Code §111 – Department of Homeland Security

15 (DHS) (b)(1)(g), to ensure the protection of civil rights and liberties and for violations of Plaintiff's

16 1st, 4th and 14th Amendment rights;  Additionally the Defendants interfered in the Plaintiff's Rights to

17 Contract and Transit in the United States navigable airspace, as declared in the Federal Aviation Act

18 of 1958, and were in violation of 14 CFR 91.11, interfering in the Plaintiff's performance of his duty

19 as a federally certificated flight officer under the FAA. (Pilot or airman used interchangeably)

20

21

22                    FEDERAL AVAITION ACT OF 1958

23     The Federal Aviation Act of 1958, (Act) Public Right of Transit, Sec. 104 states; *"There is*

24 *hereby recognized and declared to exist in behalf of any citizen of the United States a public right of*

25 *freedom of transit through the navigable airspace of the United States.*"  The Plaintiff enjoys his right

---

[1] In the United States, racial profiling is mainly used when referring to the disproportionate searching of African Americans, Hispanic and Latino Americans and Middle Eastern and South Asians, along with other visible minorities. In evidence, the defendants' entered the Plaintiff race as "Middle Eastern" in their police report.

1    to transit as a pilot certificated by the Federal Aviation Administration (FAA) which is created by The
2    Act.

3        According to FAA statistics, there were 756928 pilots by the end of 2022 of which roughly
4    13% are airline pilots, which makes roughly 0.02% of the population of the United States.  Pilots
5    exercise their right by piloting aircraft and citizens of the United States "contract" with "qualified"
6    pilots in the exercise of their right to transit under 49 U.S. Code §42112. As an agent of The People,
7    the FAA, charged with aviation safety, sets the rules and regulation by which contractual agreement
8    of transit or carriage are executed.

9        Pilots must receive FAA certification to operate aircraft and must have said certification on
10   their person. Two types of certifications are required, a pilot certificate stating the technical
11   qualifications and authorization under which a pilot may operate and a medical certificate or clearance
12   declaring a pilot's fitness for flight, which is central to this case, issued by select doctors called
13   Aeromedical Examiners (AMEs) who are selected by the FAA. Without a medical certificate or if not
14   meeting the standards of said certificate in any way a pilot may not operate aircraft as pilot in command
15   or in any other capacity as a pilot crewmember[2]. The Act is public policy, and, in addition to being a
16   right under the Act, so are the pilot and medical certificates.

17       To maintain the standards set by the FAA under 14 CFR Part 67, authority for making health
18   decisions affecting the standards of issue is vested in the pilot.  The FAA does not require, nor can it
19   require any medical treatment, cause any deficiency, or be party to any contractual agreement between
20   pilots and The People, or assume the risk on behalf of The People. (This is applicable whether it is a
21   contract of carriage or private flying)

22       The FAA's mission is that of examination to ascertain pilots meet the medical standards, and
23   as such, may not dictate any medical procedure that may create any deficiency, create a deficiency, or
24   otherwise infringe on the pilot's rights.  That is the law and as a result, during the pandemic, the FAA
25   did not regulate or require masking of pilots.  The implications of the FAA not regulating masking are

[2] 14 CFR §61.53 No person who holds a medical certificate issued under part 67 of this chapter may act as pilot in command, or in any other capacity as a required pilot flight crewmember, while that person: (1) Knows or has a reason to know of any medical condition that would make the person unable to meet the requirements for the medical certificate necessary for the pilot operation.  Restricting breathing invalidates a pilot's medical certification.

1  expansive, but the relevancy here is that pilots, who operate under FAA authority, were exempted
2  from masking, and an exemption was issued, in accordance with 49 U.S. Code §114 (g)(2), in TSA
3  SD 1542-21-01B paragraph F3[3]. Therefore, as established above, the Plaintiff has a right to transit
4  and execute a contract for carriage with The People and was exempted from masking.

6  ## RIGHT TO CONTRACT

7  Article I, Section 10, Clause 1 of the constitution: *"No State shall enter into any Treaty,*
8  *Alliance, or Confederation, grant Letters of Marque and ...pass any Bill of Attainder, ex post facto*
9  *law, or Law impairing the Obligations of Contracts, or grant any Title of Nobility."*

10  On December 6, 2021, the Plaintiff, on duty for American Airlines, had executed a contract
11  with The People that was interfered[4] with and infringed upon by the Defendants who forcefully
12  imposed a restriction on the Plaintiff that interfered with his medical standards, the foundation of his
13  contract with The People, the law, and SD 1542-21-01B §F3 exemption. In executing a contract with
14  The People, prior to reporting for duty and before each flight, pilots must make a declaration of fitness
15  for duty. These declarations and statements are made under pains of 18 U.S. Code §1001 which carries
16  a penalty of $250K, or 5 years in jail, or both, for falsifying statements made to the agency. A fit for
17  duty statement must be true and accurate as well as is contractual. None of the Defendants can be
18  party to the contract between the pilot and the agency, the FAA, and none, as agents of the state, may
19  interfere or alter the terms of the contract, especially under the provisions of Executive Order 13998
20  which demands compliance with all applicable law, and they must follow the direction of TSA SDs
21  exempting pilots from masking.

23  ## FACTUAL BACKGROUND

24  With the advent of the Corona virus, President Biden issued Executive Order 13998 (EO
25  13998), which required masking and directed agencies to immediately take action, to the extent

---

[3] TSA SD 1542-21-01B F3 states: This SD exempts the following categories of persons from wearing masks, 3. People for whom wearing a mask would create a risk to workplace health, safety, or job duty as determined by the relevant workplace safety guidelines or federal regulations.
[4] 14 CFR §91.11 Prohibition on interference with crewmembers. No person may assault, threaten, intimidate, or interfere with a crewmember in the performance of the crewmember's duties aboard an aircraft being operated.

Complaint                                    4

1    appropriate and consistent with *applicable law*. EO 13998 Sec. 2. (c) states in part: "*Exceptions.* The

2    heads of agencies may make categorical or case-by-case exceptions to policies developed under this

3    section, *consistent with applicable law, to the extent doing so is necessary or required by law.* If the

4    heads of agencies do make exceptions, ... and shall document all exceptions in writing." Under Sec.

5    6 of the order "*General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise

6    affect; (i) the authority granted by law to an executive department or agency, or the head thereof."

7        As ordered above, the FAA did not regulate masking.  Retired FAA administrator Captain

8    Steven Dickson made it clear to congress the FAA would not do that and that their mission is safety.

9    Here is the link to his testimony on capitol hill https://www.youtube.com/watch?v=mYeNyLw71rYAA

10    and a link to the story https://thehill.com/policy/transportation/aviation/503344-faa-says-it-wont-

11    make-masks-on-planes-mandatory/ . For pilots, in compliance with their medical clearance

12    requirements, masking would not be enforced while pilots are on duty[5] for aircraft operators (Airlines)

13    or in airport terminals.  As discussed above, the FAA may not create a deficiency or allow practices

14    that create any deficiencies of any level for pilots who are on duty[6] or who intend on operating aircraft.

15    Any deficiency would render a pilot medically unfit under 14 CFR §61.53 and 14 CFR Part 67 and in

16    violation of his contract with The People.

17        In compliance with the FAA rules and regulations and in accordance with 49 U.S. Code §114

18    (g)(2), which prohibits the TSA from superseding authority of other departments and agencies whether

19    or not during a national emergency, an exemption to pilot masking was issued in SD 1542-21-01B §

20    F3. Two identical exemptions in the TSA SDs were issued and renewed several times. (SD 1542 and

21    1544) One issued for airport operators and another for aircraft operators respectively and both

22    contained the identical exemption in §F3. §F3 exempts "...*People for whom wearing a mask would*

23    *create a risk to workplace health, safety, or job duty as determined by the relevant workplace safety*

24    *guidelines or federal regulation...*"  In other words, all the FAA medical standards are intended and

---

[5] 14 CFR §61.53 Prohibition on operations during medical deficiency.
[6] Definition of duty under the FAA is the following: Duty means any task that a flightcrew member performs as required by the certificate holder, including but not limited to flight duty period, flight duty, pre-and post-flight duties, administrative work, training, deadhead transportation, aircraft positioning on the ground, aircraft loading and aircraft servicing.

1   based on restriction free breathing by the individual pilot under examination and any amount of
2   restriction would invalidate a pilot medical certificate making the pilot illegal to operate aircraft.

3

4                              <u>EXCLUSIVE AREA AGREEMENT</u>

5           Because the terminal use is shared with other airlines, American Airlines does not have an
6   exclusive area agreement at the Spokane International Airport (SIA), thus, under 49 CFR §1544.235,
7   Training and Knowledge for individuals with security-related duties, SIA is responsible to train airport
8   police on SDs issued by the TSA. Plaintiff alleges that SIA failed in their obligation or intentionally
9   directed the three other Defendants to violate the mask order and force the Plaintiff into violating the
10  rules and regulations governing his medical certification. Defendant Holschen stated during the
11  encounter that all the Defendants have read and understood how the mask mandate instructed them.
12  All the Defendants refused to allow the Plaintiff to share with them the TSA SD §F3 exemption or
13  even explain to them verbally what it said. The Defendants had already racially profiled the Plaintiff
14  and were intent on violating his constitutional rights and causing him maximum harm.

15          Additionally, dated November 24, 2021, both the Airport Rescue Grants (ARG) and the
16  Airport Coronavirus Response Grant (ACRGP), administered by the FAA provided *voluntary*
17  financial assistance to airport sponsors throughout the United States. An identical statement In the
18  ARG and ACRGP frequently asked questions stated: "This document answers frequently asked
19  questions (FAQs) stakeholders may have related to the approximately $8 billion in grants for airports
20  under the American Rescue Plan Act of 2021 (ARPA), (*Plaintiff noted $2 billion under the ACRGP*).
21  The    FAA    has    additional    information    for    airport    sponsors    concerning    Covid-19    at
22  www.faa.gov/airports. The guidance here is not legally binding in its own right and FAA will not rely
23  on it as a separate basis for affirmative enforcement action or other administrative penalty. Conformity
24  with this guidance, as distinct from existing statutes, regulations, and grant assurances, *is voluntary*
25  *only,* and nonconformity will not affect existing statutes and obligations. In addition to these grants,
26  FAA is administering approximately $10 billion in grants for airports under the Coronavirus Aid,
27  Relief, and economic Security (CARES) Act and approximately $2 billion under the Coronavirus
28  Response and Relief Supplemental Appropriation (CRRSA) Act, 2021. For information on CARES

1    Act funding visit https://www.faa.gov/airports/cares_act.  For information on CRRSA Act funding

2    visit https://www.faa.gov/airports/crrsaa/"

3        Both documents answer question number Q-GA17: "Are there any requirements related to

4    mandating masks inside airports associated with Airport Rescue Grants?"

5        The answer to question Q-GA17 is: "Yes.  Under the Executive Order 13998…Security of

6    Transportation must require masks to be worn in compliance with the CDC Order in airports,

7    ***consistent with applicable law***. To accomplish this…each Airport Rescue Grant agreement will

8    include a special condition that the airport sponsor implement a policy requiring all persons to wear a

9    mask, in ***accordance with***…TSA Security Directive, as applicable…***except to the extent***

10   ***exempted***…Failure to comply with this special condition may result in the ***suspension of payments or***

11   ***termination of the grant***…"

12       Under the ARG and the ACRGP programs, SIA received $23,012,421.00.  Voluntarily

13   accepting federal funding, SIA imposed, under a voluntary conformity arrangement, mandatory

14   enforcement of masking on everyone including the Plaintiff, and after racially profiling the Plaintiff

15   and in conflict of interest with Public Policy and complete disregard of the SD instructions, violating

16   Plaintiff's authority to be exempt under Federal Aviation Rules and regulations to meet obligations he

17   has made to the agency and The People he carries, the Defendants coerced him under threat of citation

18   to place a mask over his nose and mouth restricting his breathing while on duty.  The Defendants, in

19   addition to violating the Plaintiff's rights, violated the terms of the funding agreements and must return

20   monies received back to The People[7].

21

22                              RACIAL PROFILING

23       In their dealings with the Plaintiff, the Defendants profiled him as a man of Middle Eastern

24   heritage, and Plaintiff alleges, Defendants exhibited their biases accordingly. It is true the Plaintiff is

25   of Middle Eastern heritage, however, never at any point did he declare his ethnic background or

26   national origin to the Defendants. The Plaintiff is a white man and is no different than the TSA officer

27   who summoned the police.

---

[7] Although it is not a claim in this suit, it may well be a future claim.

1         In their police report of the December 6, 2021, incident, in the subject block under race[8], the

2    Defendants inserted the term "Middle Eastern" and in a clear display of their understanding of the

3    term "race", the Defendants referred to the TSA agent who submitted the complaint as "White." We

4    may not be able to read what was on the Defendants' mind at the time, but it is in writing in an official

5    document authorized and approved by their sergeant, Defendant Rose-Watson. Each one of the

6    Defendants had the opportunity to stop the others from unlawfully detaining the Plaintiff but failed to

7    do so. Even though Defendant Holschen stated that they all read and understood the mask order, none

8    of them made any effort to stop Defendant Creek from verbally assaulting the Plaintiff and bullying

9    him into violating his medical standards[9].

10         The conduct of the Defendants was unbecoming of police officers.  The Defendants racially

11    profiled and treated the Plaintiff as a criminal[10], loudly ordering him to place a mask over the nose and

12    mouth and berating and refusing his efforts to explain his rights and obligations under the law.

13    Defendant Creek would not allow the Plaintiff to speak or explain that he was exempt from masking.

14    Defendant Rose-Watson loudly announcing, before even ascertaining if the Plaintiff was exempt, she

15    would go to the gate to notify American Airlines of the captain who refuses to wear a mask, all the

16    while his own passengers were witnessing the exchange as they passed by. Surely one would think

17    that the Plaintiff's passengers wondered what their captain did to deserve such treatment, especially

18    when followed by the presence of Defendant Rose-Watson in the gate area, which undoubtedly

19    presented the passengers with unfounded concerns about their captain, the man who was about to fly

20    them to DFW.

21         Appropriately, there is a code to guide the behavior of law enforcement officers. Title 49 U.S.

22    Code §44903 Air transportation security (a)(3) states:  To the maximum extent practicable, require a

23    uniform procedure for searching and detaining passengers (A pilot is no different in this instance) and

24    property to ensure – (B) courteous and efficient treatment by an air carrier, an agent or employee of

---

[8] The 1997 Office of Management and Budget (OMB) standards on race and ethnicity which guide the Census Bureau in classifying written responses to the race question:
White – A person having origins in any of the original peoples of Europe, the Middle East, or North Africa.
[9] The Plaintiff never violated his medical standards.
[10] It did not require three police officer to resolve the matter. One capable of carrying a conversation with an airline Captain would have sufficed.

1   an air carrier, and Government, State, and local law enforcement personnel carrying out this section.

2   There was no reason for the Defendants, as the evidence will show, not to allow the presentation of

3   the law by the Plaintiff, they simply refused and as the recordings will show, Defendant Creek stated

4   loudly that he did not care to listen and insisted on forcing a violation of the FAA medical standards.

5   The Defendants violated 14 CFR §91.11 and interfered in the Plaintiff duties as well as the TSA SD's

6   and the mask order.

7

8

9                     <u>DECEMBER 6, 2021, EVENTS LEADING TO THIS COMPLAINT</u>

10         On December 6, 2021, the Plaintiff was on duty for American Airlines and was the assigned

11   captain for flight AA484 departing SIA at six in the morning, destination Dallas Fort Worth Airport,

12   Texas. The crew consisted of the captain, co-pilot and a three-member cabin crew. On that morning,

13   and in accordance with 14 CFR §91.3, the Plaintiff, the assigned captain, was directly responsible for

14   over 150 souls on board. Duty under the certificate holder[11] rules began one hour prior to the

15   scheduled departure time.

16         At or around 5:15 AM, the Plaintiff, who was already on duty, approached the TSA security

17   checkpoint, presented his credentials, and was cleared through by TSA agent and manager Daniel

18   Hutchinson. In compliance with the Federal Aviation Regulations (FARs), respecting his medical

19   certificate and the SD 1542-21-01B §F3 exemption, the Plaintiff did not have any covering over his

20   nose and mouth. The TSA manager requested that the Plaintiff place a facial mask over the nose and

21   mouth. The Plaintiff asked the TSA manager if he was aware of §F3 exemption and the response came

22   in the negative.

23         The Plaintiff produced documents and explained to the TSA manager that he is exempt and

24   that he was following federal regulations, but the manager was not aware of or understood the

25   regulations or the exemption and insisted on contacting the SIA police. Within seconds, Defendants

26   Sergeant Tarina Rose-Watson (badge #48), Officer Clay Creek (badge #94) and Officer Richard

27   Holschen (badge #126) arrived at the security checkpoint.

---

[11] American Airlines is the certificate holder under 14 CFR Part 121

1   As alleged, among other factors, the actions taken by the Defendants from this moment forward
2   were driven by and grounded in racial profiling and were a clear act of maladministration and a willful
3   violation of the Plaintiff's Constitutional rights and the laws of the land including 6 U.S. Code 111-
4   DHS (b)(1)(G)[12].

5   Upon the Defendants arrival, the Plaintiff asked who he would be addressing.    Initially,
6   Defendant Rose-Watson started the discussion but quickly removed herself, made her loud
7   announcement she would be going to notify American Airlines, and Defendant Creek became the one
8   interacting the most with the Plaintiff. Defendant Watson, prior to ascertaining whether the Plaintiff
9   is in violation of any rule[13], loudly announced she was proceeding to the gate area to inform American
10  Airlines about the captain who is refusing to wear a mask. Defendant Watson can be  heard, on a
11  recording in the possession of the Plaintiff, seeking confirmation from the American Airlines gate
12  agent, Tony, of the requirement for pilots to wear a mask. Tony is not an authority on the TSA SD's
13  or FAA rules and regulations for pilots, and Defendant Watson demonstrated ignorance and a lack of
14  knowledge of the rules and the law. It was irresponsible and detrimental to the Plaintiff's livelihood
15  that Defendant Watson, and later the remaining Defendant officers, contacted American Airlines
16  before ascertaining the language of the law and that of the mask order.   The Defendants were
17  determined to punish a man of Middle Eastern heritage.

18  SD 1542-21-01B does not direct or instruct the Defendant officers to notify the employer of a
19  person who refuses to cover their nose and mouth and more specifically and importantly the Plaintiff's
20  employer. In addition to the fact SD 1542-21-01B contained an exemption for pilots, which the
21  Defendants violated, paragraph (B)(1)(2) of the SD specifically directed the Defendants to escort a
22  person, who refuses to cover their nose and mouth, from the airport and a report with the agency may
23  later be filed.  As indicated above, American Airlines does not have an exclusive area agreement for
24  SIP and only a report should have been submitted to SIP security coordinator.  The actions by the
25  Defendant officers have caused great harm, financial losses, and created a threat to the remainder of

---

[12] Ensure civil rights and liberties.
[13] As described later, she displayed ignorance of the rules when seeking confirmation from the American Airlines gate agent.

1   the Plaintiff's career with American Airlines[14]. As a result, the Plaintiff has not been able to return to

2   work since December 6, 2021, has been on unpaid leave since August 22, 2022, has lost his benefits

3   including medical coverage for his family. The Plaintiff has been subjected to brutal police behavior

4   of the kind that is not recoverable. In comparison, a physical assault may have already been recovered

5   from since December 6, 2021.

6         In an effort to explain to the Defendants the reason for not covering his nose and mouth, the

7   Plaintiff attempted to produce the documents supporting the fact he was exempt, and, as required by

8   law, was complying with his pilot medical certificate and federal standards, but Defendant Creek

9   refused to listen outright and would not allow the Plaintiff to speak.  The Plaintiff even attempted to

10  explain, to no avail, that in accordance with the SD a person may even remove the cover to catch his

11  breath (*a footnote in the SD*). Defendant Creek simply refused to listen and insisted that the Plaintiff

12  must place a mask over his nose and mouse. (It is all on the recording in the possession of the Plaintiff)

13  Defendant Creek declared that he did not care to listen to the Plaintiff and loudly ordered him to "put

14  the dang mask on."  The Plaintiff's attempts to inform the officer Defendants of his constitutional and

15  statutory rights and obligations were met with absolute rejection and disregard.  By refusing to allow

16  the Plaintiff the presentment of the law and regulations, the Defendants were unreasonable and

17  verbally abusive. Defendant Creek indicted to the Plaintiff that he would be the first to get a citation

18  for not wearing a mask, in his words: "…you don't want to be the first to get a citation for not wearing

19  a mask…" The Plaintiff was simply following the law.

20        Federal regulation 14 CFR §61.53[15] - Prohibition on operations during medical deficiency

21  states in part the following: "(a) Operations that require a medical certificate.  Except as provided for

22  in paragraph (b) of this section, no person who holds a medical certificate issued under part 67 of this

23  chapter may act as pilot in command, or in any other capacity as a required pilot flight crewmember,

24  while that person: (1) Knows or has a reason to know of any medical condition that would make that

25  person unable to meet the requirements for the medical certificate necessary for the pilot operation."

26  All the FAA medical standards under 14 CFR Part 67 are predicated on unrestricted breathing and

---

[14] The legality of American Airlines actions is a matter in other litigation in suits filed by the Plaintiff.
[15] 14 CFR part 61.53 gives pilots the ultimate decision making as it relates to their fitness for duty.  Other rules and regulations along with FAR 61.53 assist the pilots in making that decision.

1    thus the foundation for F3 exemption in the SD.  Violating the medical standards may result in
2    administrative action by the agency or worse, diminish a pilot's abilities in the performance of his
3    duties.

4          The Plaintiff attempted once again to introduce the exemption and the regulations to resolve
5    the disagreement, but Defendant Creek was defiant and adamant, stood within 12 inches of the
6    Plaintiff's face in a threatening posture, refused to listen to what the Plaintiff had to say and insisted
7    the Plaintiff cover his nose and mouth. Defendant Creek stated that he did not care to listen, and that
8    the Plaintiff kept talking about the mandate and that he did not care.  Defendant Creek was
9    unreasonable, refused to listen to the Plaintiff, actively suppressed the Plaintiff's free speech and, in a
10   coercive measure, threatened to issue a $13,000.00 citation if the Plaintiff did not put on a mask. The
11   Plaintiff alleges Defendant Creek suppressed and violated his First Amendment rights.  Attempting to
12   intimidate and coerce the Plaintiff, Defendant Creek falsely claimed to have the authority to issue a
13   citation. Defendant Holschen did not stop Creek or intervene to allow Plaintiff to present the law.

14         The Plaintiff had been passing through all TSA check points across the country without a mask
15   and without interference. Once in Chicago on November 12, 2021, he was asked to wear a mask and
16   after sharing the exemption and the federal aviation law respecting a pilot medical certificate, he was
17   waved through without requiring him to wear a mask.  The TSA manager's name on that day is Nick
18   Sutton.

19         The Plaintiff was certain that something else is driving these officers to force him to wear a
20   mask and restrict his breathing in violation of the medical standards, and his suspicions became evident
21   after reading the police report by which they indicated racial profiling.

22         At this point, the Plaintiff was facing a Hobson's choice, cover the nose and mouth, and violate
23   the FAA medical standards, or comply with federal rules and regulation respecting safety of flight and
24   risk a citation by Defendant Creek[16]. The choice for the Plaintiff was simple, comply with federal law
25   under §61.53, for which the Plaintiff has done for the last 38 years, and the SD §F3 exemption. The
26   Plaintiff is contractually obligated to operate safely and to follow the FAA rules and regulation, he has

---

[16] Even though the Plaintiff was confident Creek did not have the authority, it would still have caused major issues to be resolved.

1   an exemption issued by the TSA, which is what he attempted to convey to the Defendants, so he simply

2   stated he would not be covering his nose and mouth or restricting his breathing in any way.

3       After about a fifteen-minute unlawful detention from the moment he entered the TSA check

4   point, the Plaintiff was released and allowed to proceed to the gate area without any cover.  Personal

5   contact information was taken by the TSA and the police officers.  Upon arrival at the gate, the Plaintiff

6   saw Defendant Watson huddled in a corner with American Airlines gate agent, Tony, having a

7   conversation.  The Defendants consented to allowing the Plaintiff through, but their actions next took

8   on a new dimension, that of exacting punishment on the Plaintiff in cooperation and coordination with

9   his employer. The Defendants and AA conspired against the Plaintiff.

10

11   ## DEFENDANTS' DECISIONS

12       During the encounter, another American Airlines pilot, First Officer Ray Crownhart who lives

13   locally and was commuting to Dallas on the Plaintiff's flight, passed by the TSA security, and

14   witnessed part of the exchange.  He later commented to the Plaintiff about the professionalism he

15   displayed at the check point.  Because the flight was full, First Officer Crownhart occupied the flight

16   deck jump seat[17],  a typical practice for commuting pilots. Ray was a frequent commuter and knew

17   Tony, the American Airline gate agent, very well.  Once underway to Dallas, Ray informed the

18   Plaintiff that "For whatever it is worth" the American agent told him that he was given authority by

19   the police to decide, or to call the shots, and that Tony informed the police that he wanted an on-time

20   departure.  A line of communications between the police and American's agent existed immediately

21   after Plaintiff's entry into the TSA checkpoint, and the American gate agent directed the Defendants

22   to allow the Plaintiff through in favor of an-time departure.

23       There is evidence the Defendants did not make their decision independently, it was predicated

24   on the needs of American Airlines which lay the foundation of conspiracy against the Plaintiff.  Further

25   in a conversation between the gate agent and Defendant Watson, Watson was heard seeking

26   confirmation of the pilot's need to wear a mask from the agent[18], indicating ignorance and lack of

---

[17] A seat that is not a passenger seat that may be occupied by additional qualified crewmembers who receive authorization to do so.
[18] AA gate agent is not an authority on pilot masking, the TSA SD, or FAA rules and regulations.

1  understanding of the rules and regulations. In other words, the uncertainty the sergeant had regarding
2  the requirements of masking was on display in that conversation and neither the agent nor the sergeant
3  knew the law or the presence of an exemption in the TSA SDs.

4        In their police report, in addition to racially profiling the Plaintiff, the Defendants made the
5  statement referencing the Plaintiff's performance: "...His actions caused a delay of appx 1 minute
6  according to the station manager..." indicating a line of communications between the Defendants and
7  the gate agent existed and bias in favor of American Airlines. There is no conceivable way that anyone
8  could assign a 1-minute delay to the Plaintiff's actions, and it certainly is not police business to indicate
9  so in a police report, a further indication of the cooperation between the police and American in
10  assigning the blame to the Plaintiff, attack his character, and paint him as an irresponsible individual.
11  As a matter of fact, if it were not for the unlawful detention by the Defendants, the Plaintiff could have
12  departed as early as 10 minutes in accordance with AA policies.

13        Following the Defendants communications with the American Airlines gate agent, they
14  proceeded to communicate directly with the American Airlines Phoenix, Arizona security coordinator,
15  a Mr. John A. Kirby. In emails the following day on December 7, 2021, after an apparent telephone
16  conversation with Mr. Kirby, Defendant Watson thanked Mr. Kirby for his time and proceeded to
17  provide the case number and the names of the officers involved. Also, the Defendants detailed
18  instructions on how to receive a copy of the police report. Defendant Watson suggested obtaining
19  body camera footage and further informed Mr. Kirby that: "...Once you receive the requested
20  documents, I can further assist whomever is investigation this case. Especially in knowing why
21  charges where not sanctioned on this individual..." and "...I'm back to work on Sunday, December
22  12th at 6am. I will be working Sunday-Wednesday next week..." and "...If you need any additional
23  assistance, please feel free to reach out to me..." and in a follow up email a short while afterwards,
24  Defendant Watson dispensed advice to American to contact the TSA for more reporting and
25  information about the event. In the second email from Watson, she wrote: "...I should add that TSA's
26  report of the incident is separate from ours and ***should*** be considered...The head of our local TSA
27  Regulatory is Amanda Weigum and she can be reached at 509-626-5413...That way you can see
28  Saliba interaction with those folks..." The Defendants gave American their work schedule so they can

1    further communicate[19] and provide details of the event, which they apparently did as the Plaintiff

2    learned during the hearings conducted by American.    The Defendants were eager and intent on

3    harming the Plaintiff and actively made efforts to further the punishment within the American Airlines

4    system.

5

6    <u>ARRIVAL AT DALLAS AIRPORT</u>

7         Upon arrival in Dallas, the Plaintiff was immediately removed from flying and placed on

8    administrative leave pending a disciplinary hearing.    In a conversation with the Plaintiff's immediate

9    supervisor, Captain Kenneth Wood, the Plaintiff was told that: "Washington State is after you," that

10   is the Washington State police, and although Captain Wood agreed with the Plaintiff's interpretation

11   of the law and stated his intent to make calls to resolve the matter, he was removed from acting in any

12   capacity in further interactions with the Plaintiff.    The events within American took a turn for the worst

13   for the Plaintiff and after several disciplinary hearings, he has been placed on unpaid leave and is

14   unable to return to work.    Now the Plaintiff is facing possible termination.    During the first disciplinary

15   hearing the Plaintiff was subjected to, he was informed by Captain Timothy Raynor who flew from

16   Chicago to conduct the hearing, that the Police communicated with them directly and that they,

17   American Airlines, informed the police that they would take over and discipline the offending captain

18   internally.

19        The exact words from the hearing were[20]: "...TSA and local authorities had an encounter with

20   you going through ... That information was brought to Ken. And they were going to actually press

21   charges but turned over to American Airlines to handle it within our own system, which brings us to

22   this ... American Airlines said we will take this, he is our pilot, we will handle this section – we call

23   it Section 21 process, but we will work through the disciplinary process on the American Airlines

24   side." and when questioned, Raynor further said that the police actually are: "...partners with us.    They

25   work with us..."    There is enough evidence to indicate there were verbal communications with the

26   police in which American indicated they will act against the Plaintiff internally.

---

[19] More than likely by telephone, otherwise email would have been sufficient.
[20] A transcript of the hearing is in the possession of the Plaintiff.

1    It is not police business to contact the Plaintiff's employer to report the encounter, and certainly
2    the Defendants were not directed to do so in the TSA SD. Doing so has caused great harm to the
3    Plaintiff and may cut his career with the airline seven years early, the most productive and lucrative
4    years in the career of an airline pilot.

5    As a result of the Defendants actions, and as the Ninth Circuit Court adopted, "if it were not
6    for the actions," of the Defendants the Plaintiff would not have suffered harm. The Defendants had
7    no authority to.

8    1- Force masking on the Plaintiff while on duty for the carrier in violation of the §F3
9        exemption in SD 1542-21-01B.

10    2- Interfere in the Plaintiff's right to contract and transit while on duty.

11    3- Detain the Plaintiff while on duty.

12    The Defendants racially profiled the Plaintiff, conspired with American Airline to continue to
13    punish him and violated his constitutional rights, namely the right to contract and his 1st, 4th, and 14th
14    amendment rights. The Defendants acted not as law enforcement officers but rather as law makers
15    enforcing their own law. The Defendants did not follow the law and acted as vigilantes.

16
17

18                                    IN CONCLUSION

19    The Plaintiff, an on-duty airline captain, was racially profiled as Middle Eastern, then, while
20    in compliance with the Federal Regulations and exemption §F3 in the TSA SD 1542-21-01B, was
21    unlawfully detained, and subjected to abusive and coercive efforts, by the Defendants, to forcefully
22    cover his nose and mouth restricting his breathing in violation of the FAA medical standards. The
23    Defendants did not allow efforts made by the Plaintiff to present the law governing his job performance
24    and his rights and obligations and refused his attempts entirely, insisting he follows their demands.
25    Police actions publicly humiliated and defamed the Plaintiff before his passengers and crewmembers.
26    The Defendants then took their abuse of power beyond authority given to them in the TSA SD. They
27    made a concerted effort to reach deep into the Plaintiff's workplace to communicate their desire to
28    punish the Plaintiff by directing his employer to continue to persecute him and exact maximum

1    punishment. The Defendants conspired[21] .with Plaintiff's employer to subject him to disciplinary

2    hearings resulting in his inability to fly for the airline since the event on December 6, 2021.

3

4    The Defendants:

5        1- Racially profiled the Plaintiff and acted in malice to harm him.

6        2- SIA has failed to prevent racial profiling and failed to comply with 49 U.S. Code

7           §1544.235. Did not comply with TSA SD §F3 exemption and, by employing the Spokane

8           police who conducted enforcement business for SIA, enforced masking against the

9           Plaintiff.

10       3- Unlawfully detained the Plaintiff while he was on duty for his employer.

11       4- Violated the mask exemption in §F3 of the TSA SD.

12       5- Conspired with American Airlines to deprive the Plaintiff of his constitutional rights and

13          unlawfully punish him using the airline machinery.

14       6- Defendants interfered in the Plaintiff's Rights to Contract and Transit in the United States

15          navigable airspace as affirmed in the Federal Aviation Act of 1958, Sec. 104.

16       7- Defendants violated Plaintiff's 1st, 4th, and 14th Amendment rights.

17       8- Defendants interfered in the Plaintiff's performance of his duty as a federally certificated

18          flight officer under the FAA.

19

20

21                              **PRAYER FOR RELIEF AND REMEDY**

22            WHEREFORE, plaintiff respectfully requests the Court enter the following judgment and

23    relief:

---

[21] Blacks law: Conspiracy. A combination or confederation between two or more persons formed for the purpose of committing, by their joint efforts, some unlawful or criminal act, or some act which is lawful in itself, but becomes unlawful when done by the concerted action of the conspirators, or for the purpose of using criminal or unlawful means to the commission of an act not in itself unlawful.

A. Enter a permanent injunction against Defendants continued or future enforcement of masking on pilots in violation of 14 CFR part 67 medical standards requirements.

B. Declare actions taken by Spokane Airport police in violation of SD 1542-21-01B §F3.

C. Declare the enforcement of mask wearing upon pilots a violation of the pilots' authority of decision making relating to their health and safety and the safety of crew and passengers.

D. Declare the enforcement of mask wearing upon pilots an interference in the pilots' authority in declaring fit for duty and enforcing masking is interference in pilot authority and in the performance of pilot duties.

E. Enter judgment in Plaintiff's favor on all causes of action alleged herein pursuant to 42 U.S. Code §1983 and the First, Fourth and Fourteenth Amendments of the United States Constitution.

F. Enter judgement against defendants and award plaintiff compensatory damages in the amount of $586,964.38 (damages will be adjusted to higher amounts with passage of time and new contractual agreements between American Airlines and the union representing the pilots)

G. Enter judgement against defendants and award plaintiff punitive damages for pain and suffering and for violating his constitutional rights in the amount of $23,012,421.00, or higher amounts as the court sees fit to punish defendants for their actions.

H. Award plaintiff reasonable costs and attorney fees, if retained, pursuant to 42 U.S. Code §1988; and,

I. Grant plaintiff such other and further legal and equitable relief as the Court deems just and proper.

**JURY DEMAND**

NOW COME Plaintiff, Pro Se, and hereby demands trial by Jury of the above-referenced causes of action.

Dated this 26th day of July 2023.

Bahig Saliba

10824 E Santa Fe Trail

Scottsdale, AZ  85262

Tel. 480-235-0304

Email: medoverlook@protonmail.com

Complaint                                          19